UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

PEGGY WALDBILLIG,

        Plaintiff,

        v.                                      Case No. 08-C-1002

SSC GERMANTOWN OPERATING
COMPANY LLC
*doing business as*
Sava Senior Care, Virginia Highlands
Health and Rehabilitation Center,

        Defendant.

---

### DECISION AND ORDER DENYING RULE 12(B)(1) MOTION TO DISMISS BUT GRANTING REQUEST TO COMPEL ARBITRATION AND DISMISSING CASE UNDER THE FEDERAL ARBITRATION ACT

        SSC Germantown Operating Company LLC moves to dismiss Peggy Waldbillig's complaint, or, in the alternative, to compel Waldbilllig to submit her employment-related claims to SSC Germantown's Employee Dispute Resolution Program ("EDR Program") and either stay or dismiss this case if arbitration must take place. SSC Germantown argues that this court lacks subject matter jurisdiction or should compel arbitration because Waldbillig, as a condition of continued employment, agreed to resolve workplace disputes through the EDR Program, which requires arbitration.

        Waldbillig is a former employee at the Virginia Highlands nursing home facility. (Ahlert Decl. ¶ 6.) Virginia Highlands is owned and operated by SSC Germantown. (*Id.* ¶ 3.) Waldbillig was an employee of SSC Germantown or its predecessors at Virginia Highlands for almost twenty-five years, until August 25, 2008, when SSC Germantown

terminated her employment. (Notice of Removal Ex. B ¶ 3; *see* Ahlert Decl. ¶ 6.) Waldbillig was SSC Germantown's Human Resources Coordinator at Virginia Highlands. (Waldbillig Aff. ¶ 2.)

Prior to Waldbillig's termination, SSC Germantown informed her that she was not meeting performance expectations. (Notice of Removal Ex. B ¶ 9.) On August 22, 2008, SSC Germantown presented Waldbillig with two options: (1) agree to a 30-day action plan, or (2) give a thirty-day notice of her "retirement" and receive a six-week severance package and vacation pay. (*Id.*) Waldbillig replied on August 25, 2008, that she accepted the second option, and offered her resignation upon the expectation that she would receive the severance and accrued benefits. (*Id.* ¶ 10; LaFave Aff. Ex. 3.) Instead, SSC Germantown immediately discharged Waldbillig and gave Waldbillig a "Separation and General Release Agreement" to sign. (*See* Hildebrand Aff. Ex. 2; LaFave Aff. Exs. 3, 4.) SSC Germantown has not paid the thirty-day salary or the six-week severance package promised to Waldbillig. (Notice of Removal Ex. B ¶ 12.) It is the position of SSC Germantown that payment of thirty days of salary and six weeks of severance pay are conditioned upon Waldbillig's execution of "Separation and General Release Agreement." (*Id.* ¶ 12.)

On October 24, 2008, Waldbillig filed this lawsuit in Milwaukee County Circuit Court. (Notice of Removal Exs. A, B.) She asserts five claims based on state and federal law. First, Waldbillig proceeds on a claim for unpaid overtime wages under Wis. Stat. ch. 109 and the Fair Labor Standards Act ("FLSA"). (*Id.* ¶¶ 15-19.) Second, she advances a claim under Wis. Stat. ch. 109 and FLSA for accrued hours earned and accumulated in her

"Extended Illness Bank." (*Id.* ¶¶ 20-24.) Third, Waldbillig asserts a promissory estoppel claim respecting severance pay—she alleges that SSC Germantown promised to provide her severance pay to deceive her into resigning. (*Id.* ¶¶ 25-29.) Waldbillig's fourth and fifth claims are for intentional misrepresentation related to severance pay and Extended Illness Bank hours. (*Id.* ¶¶ 30-41.)

On November 21, 2008, SSC Germantown removed Waldbillig's case to this court. Afterward, this court denied Waldbillig's motion to remand, finding that the case was removed properly based on federal question and diversity jurisdiction. (Decision & Order Denying Pl.'s Mot. to Remand.)

Now, SSC Germantown seeks dismissal under Fed. R. Civ. P. 12(b)(1), contending that this court lacks subject matter jurisdiction because Waldbillig, as a condition of continued employment, agreed to resolve workplace disputes through SSC Germantown's EDR Program. Alternatively, SSC Germantown asks this court to stay proceedings and compel Waldbillig to pursue her employment-related claims through the EDR Program. (Def.'s Mot. to Dismiss ¶ 7.)

The motion to dismiss for lack of subject matter jurisdiction will be denied. Previously, the court determined that it has subject matter jurisdiction based on federal question and diversity jurisdiction. That Waldbillig may have waived her right to a court forum does not affect this court's authority to consider the case. Waldbillig's waiver of her right to a court forum may be an affirmative defense or may indicate she has not satisfied a condition precedent to proceeding in court, matters appropriate for a summary judgment or other motion, but SSC Germantown provides no authority indicating that Fed. R. Civ. P. 12(b)(1) is the correct vehicle for its challenge.

3

Nevertheless, the court will address SSC Germantown's alternate request under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3, 4. The FAA allows a party to an arbitration agreement to petition the district court to compel arbitration in the manner provided for in the agreement. 9 U.S.C. § 4. Congress intended this remedy "[t]o overcome judicial resistance to arbitration." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006). Further, Congress declared "a national policy favoring arbitration of claims that parties contract to settle in that manner." *Preston v. Ferrer*, 552 U.S. 346, 353 (2008) (internal quotation marks omitted); *see Hodge Bros., Inc. v. DeLong Co.*, 942 F. Supp. 412, 414 (W.D. Wis.1996) (noting a strong federal policy favoring arbitration). Thus, Congress has provided that arbitration agreements in contracts involving commerce are "valid, irrevocable, and enforceable." 9 U.S.C. § 2.

The FAA also provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

This case presents two questions: (1) whether Waldbillig is required to pursue her overtime, Extended Illness Bank, and severance pay claims in arbitration under SSC Germantown's EDR Program, and (2) if the court finds Waldbillig is required to arbitrate, whether this case should be stayed or dismissed.

4

(1)     The Arbitration Agreement Applies to Waldbillig's Claims

Parties enter into an arbitration agreement as a matter of contract. "An agreement to arbitrate, including one entered into between an employer and an employee, is like any other contract." *Tupper v. Bally Total Fitness Holding Corp.*, 186 F. Supp. 2d 981, 986 (E.D. Wis. 2002) (citing *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir.1997)). "[T]he FAA does not require parties to arbitrate when they have not agreed to do so." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989). Thus, the scope of claims included and excluded from arbitration is determined by the parties. *Id*. The FAA "simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." *Id.*

While federal policy favors arbitration, courts must apply state contract law to determine whether a binding arbitration agreement exists. *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 733 (7th Cir. 2002). Wisconsin law presumes arbitration provisions to be valid, and arbitration agreements are evaluated in the same manner as other contracts. *Wis. Auto Title Loans, Inc. v. Jones*, 2006 WI 53, ¶ 28, 290 Wis. 2d 514, ¶ 28, 714 N.W.2d 155, ¶ 28. Hence, a court interpreting an arbitration agreement looks to the intent of the parties. *See FPL Energy Point Beach, LLC v. Energy Resources of Australia Ltd.*, 565 F. Supp. 2d 999, 1004 (W.D. Wis. 2008). If there is no ambiguity in the agreement, the court's "attempt to determine the parties' intent ends with the four corners of the contract." *Huml v. Vlazny*, 2006 WI 87, ¶ 52, 293 Wis. 2d 169, ¶ 52, 716 N.W.2d 807, ¶ 52. Moreover, contract terms are given their plain, ordinary meaning. *Id.*

The terms of SSC Germantown's EDR Program are set forth in an EDR Program booklet. (Ahlert Decl. ¶ 8 Ex. 1.) The program "covers all management and non-union employees of the Company." (Ahlert Decl. Ex. 1 at 3 of 15.) Waldbillig does not dispute that she was a non-union employee to whom the EDR Program applied. Further, Waldbillig does not dispute that she was aware of the EDR Program. She signed two acknowledgment forms, on or about April 29, 2002, and October 26, 2006, indicating she received a copy of the EDR Program booklet. (Ahlert Decl. Exs. 2, 3.)

The EDR Program booklet provides:

> Your decision to accept employment or to continue employment with the Company constitutes your agreement to be bound by the EDR Program. This mutual agreement to arbitrate claims means that both you and the Company are bound to use the EDR program as the only means of resolving employment related disputes and to forego any right either may have to a jury trial on issues covered by the EDR Program. However, no remedies that otherwise would be available to you or the company in a court of law will be forfeited by virtue of the agreement to use and be bound by the EDR Program.

(Ahlert Decl. Ex. 1 at 1 of 15.) Further, the EDR Program booklet states that an arbitrator will apply the same substantive federal or state law that a court would apply to the dispute and may award the same remedies as a court could. (Ahlert Decl. Ex. 1 at 1 of 15, 8 of 15.)

Regarding what disputes are covered, the booklet states that the EDR Program is

> the process for resolving most workplace disputes between [the employee] and the Company, including, but not limited to, disputes concerning legally protected rights such as freedom from discrimination, retaliation or harassment. It remains effective for the entire length of your employment and

6

> continues in effect should your employment end. All employees must use the EDR Program as the sole means of dispute resolution.
> . . . .
> Disputes covered under the EDR Program pertain to claims such as discipline, discrimination, fair treatment, harassment, termination and other legally protected rights.
> Disputes not covered under the EDR Program relate to workers' compensation, unemployment benefits, health, welfare and retirement benefits and claims by the Company for injunctive relief to protect trade secrets and confidential information.

(Ahlert Decl. Ex. 1 at 3 of 15.) In addition, employees retain the right to pursue employment disputes before federal or state administrative agencies. (*Id.*)

After a $50 fee for arbitration is paid by the employee, SSC Germantown pays the remainder of the administration costs for the arbitration as well as the arbitrator's fees and expenses. (*Id.* at 8 of 15.) In addition, SSC Germantown may pay up to $2000 for the employee's attorney's fees. (*Id.* at 9 of 15.)

In a "Question and Answers" section of the booklet SSC Germantown responds to the question "If I don't want to go through Mediation or Arbitration, can I go to court?" with the following:

> No. By choosing to work at the Company or remaining employed with the Company, you have agreed to not go to court for issues covered by the EDR Program. Similarly, the Company has agreed to be bound by the EDR Program. If you attempt to take a dispute to court, the Company will seek to enforce the EDR Program and remove it from the court system.

(*Id.* at 11 of 15.)

Waldbillig argues the arbitration agreement is not enforceable because sufficient consideration was not exchanged. An agreement to arbitrate may be found

7

unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Under Wisconsin law, to be enforceable a contract must be supported by consideration, which "consists of either a detriment to the promisor or a benefit to the promisee." *Tinder*, 305 F.3d at 734.

Waldbillig argues that she was already employed with SSC Germantown at the time she signed the agreement, so SSC Germantown had to give her "something more" for her agreement to forego judicial resolution of her claims. (Pl.'s Br. in Resp. at 18.) However, SSC Germantown did give Waldbillig "something more," as it bound itself to the arbitration agreement. (Ahlert Decl. Ex. 1 at 1 of 15, 11 of 15.) In further consideration, SSC Germantown agreed to pay the costs of arbitration over $50, the arbitrator's fees, and up to $2,000 in attorney fees for employees who used arbitration.

As SSC Germantown notes, "[c]onsideration for one party's promise to arbitrate can be the other party's promise to do the same." *Scaffidi,* 2006 U.S. Dist. LEXIS 50546, at *6. "An employer's promise to arbitrate in exchange for an employee's promise to do the same constitutes sufficient consideration to support the arbitration agreement." *Tinder*, 305 F.3d at 734. The Seventh Circuit has held that it is immaterial whether the promise takes place before employment commences or during the employment. *Tinder*, 305 F.3d at 734. Like SSC Germantown, the defendant in Tinder decided unilaterally to implement an arbitration program applicable to existing employees. *Id*. at 731. The Seventh Circuit held the agreement had sufficient consideration and was enforceable. The court noted: "Wisconsin recognizes that, because at-will employees are free to quit their

8

jobs at any time, at-will employees give adequate consideration for employer promises that modify or supplant the at-will employment relationship by remaining on the job." *Id*.

That SSC Germantown exempted its own trade secrets and confidential information claims from the EDR Program does not mean that SSC Germantown gave insufficient consideration. That small category of claims does not negate other consideration involved in SSC Germantown binding itself to arbitration. SSC Germantown's exemption of trade secrets and confidential information claims from arbitration differs substantially from the broad carve-out in *Wisconsin Auto Title Loans*, where an arbitration agreement required the borrower to arbitrate all claims while the lender could enforce the borrower's payment obligations by judicial or other process, including self-help. *See* 2006 WI 53. Moreover, SSC Germantown balanced its trade secrets and confidential information exemption with an exemption *for employees* regarding proceedings before administrative agencies.

Consideration existed here because SSC Germantown made a promise to continue employing an at-will employee, and, likewise, Waldbillig made a promise to continue working for SSC Germantown; both bound themselves to arbitrate; and SSC Germantown agreed to pay most expenses and up to $2,000 in attorney fees.

Waldbillig's next attack is on whether the EDR Program covers her particular disputes; she contends that wage disputes are not included in the EDR Program's scope. According to Waldbillig, her job included explanation of the EDR Program to new employees. However, no one in management told her that the EDR Program covered wage-related disputes. Waldbillig swears that she understood the EDR Program to cover

9

employees seeking to contest a disciplinary action or terminated employees seeking re-employment with the company, but excluded pre- or post-employment wage disputes. (Waldbillig Aff. ¶¶ 4-7.) However, Waldbillig's personal understanding of the EDR Program does not control. The terms of the EDR Program booklet, to which Waldbillig agreed by her written acknowledgments, control.

Waldbillig points to the language in the EDR booklet providing that the EDR Program is "for resolving *most* workplace disputes," and that covered disputes are those "pertain[ing] to claims such as discipline, discrimination, fair treatment, harassment, termination and other legally protected rights." (Ahlert Decl. ¶ 11, Ex. 1 at 1 of 15 (emphasis added), 3 of 15.) She argues that because the description of covered disputes does not include "a broad, all-inclusive 'arising out of' clause" her wage claims necessarily fall outside its scope. (Pl.'s Br. in Resp. at 8.) She cites cases in which courts found arbitration agreements to cover a broad range of subject matter simply because the drafters of the agreements included "arising out of" or "relating to" language. (*Id.*) Waldbillig says SSC Germantown could have used such an inclusive clause, but did not, leaving "the door wide open for both the employer and employee to interpret the agreement in such a way as to exclude those disputes not listed." (Pl.'s Br. in Resp. at 9.) In her view, because SSC Germantown did not use a broad clause and did not explicitly state that wage claims were to be submitted to the EDR Program, it was reasonable for her to presume wage claims were not covered. (*Id.*) Further, she says, wage claims are more akin to the employment benefit items explicitly excluded by the EDR booklet description, such as workers' compensation, unemployment benefits, health, welfare and retirement

10

benefits, than the employment conduct items explicitly included. (*Id.* at 10.) However, the EDR Program encompasses "termination and other legally protected rights" and "continues in effect should your employment end." (Ahlert Decl. Ex. 1 at 3 of 15.)

At least four of Waldbillig's claims pertain to her termination. The claims for severance payments relate directly to her termination, and her claims for an Extended Illness Bank payout also relate to her termination. Moreover, these four claims *and* the overtime payment claim fall within the scope of legally protected rights under the FLSA, Wis. Stat. ch. 109, and state tort law.

Although the EDR booklet may not include specific "arising from" language, it uses other broad statements. The EDR Program booklet includes, "*but is not limited to*, disputes concerning legally protected rights" and "claims *such as* discipline" and others (*id.* at 3 of 15 (emphasis added)), suggesting broadness. The booklet states that employees "must use the EDR Program as the sole means of dispute resolution." (*Id.*) The EDR Program is used for *most* disputes, suggesting that only those specifically excluded fall outside the program.

Finally, Waldbillig's claims as brought are more similar to the included claims than to the excluded claims. The overtime and severance claims are more like "fair treatment," or "other legally protected rights" than claims involving possible third-party payors such as workers' compensation or unemployment benefits or retirement plans. Waldbillig has asserted that her right to an Extended Illness Bank payout and severance pay arises from SSC Germantown's promises and actions, not from any health or welfare benefit plan claim such as might be exempted from the EDR Program.

11

The FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Consequently, the court finds that the language of the EDR Program booklet covers all five of Waldbillig's claims in this case. But even if an ambiguity existed, the scope of the arbitration clause nevertheless would be resolved in favor of arbitration.

Next, Waldbillig argues that the EDR Program is unenforceable because unconscionable. In Wisconsin, unconscionability means "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Disc. Fabric House of Racine, Inc. v. Wis. Tel. Co.*, 117 Wis. 2d 587, 601 (1984) (internal quotation marks omitted). To determine whether a contract is unconscionable, a court weighs procedural and substantive factors on a case-by-case basis. *Wis. Auto Title Loans*, 2006 WI 53, ¶¶ 29, 33; *Disc. Fabric House of Racine, Inc.*, 117 Wis. 2d at 602. Procedural factors include the "age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, [and] whether there were alternative sources of supply for the goods in question." *Disc. Fabric House of Racine, Inc.*, 117 Wis. 2d at 602 (internal quotation marks omitted); *accord Wis. Auto Title Loans*, 2006 WI 53, ¶ 34. Substantive unconscionability refers to the reasonableness of the contract terms agreed upon by the contracting parties,

12

considered in the light of the commercial background and commercial needs.  *Wis. Auto Title Loans*, 2006 WI 53, ¶¶ 35, 36*; Disc. Fabric House of Racine, Inc.*, 117 Wis. 2d at 602.  "To tip the scales in favor o[f] unconscionability requires a certain quantum of procedural plus a certain quantum of substantive unconscionability."  *Disc. Fabric House of Racine, Inc.*, 117 Wis. 2d at 602; *accord Wis. Auto Title Loans*, 2006 WI 53, ¶ 35.  "The more substantive unconscionability present, the less procedural unconscionability is required, and vice versa."  *Wis. Auto Title Loans*, 2006 WI 53, ¶ 33.  The party seeking to invalidate the provision in a contract has the burden of establishing unconscionability.  *Id.*, ¶ 30.

Waldbillig argues that procedurally SSC Germantown exploited Waldbillig's "lesser education and sophistication" by causing her to sign an "ambiguous" arbitration agreement that made it impossible for her to discern that she was waiving her right to file wage claims in court and used its superior bargaining power to force Waldbillig into signing the arbitration agreement in a "take it or leave it manner."  Further, she contends that her nearly twenty-five-year tenure as an employee for SSC Germantown made it unlikely that she could find alternative employment in a similar capacity; and, with few other comparable employment options, she had no other choice but to accept the arbitration agreement.  (Pl.'s Br. in Resp. at 15.)  Additionally, Waldbillig maintains the lender in *Wisconsin Auto Title Loans*, SSC Germantown has exploited its bargaining power to force her into accepting an agreement she did not understand fully.  Lastly, she turns to *Discount Fabric House of Racine, Inc.*, in pressing its unconscionability claims.  *See* 117 Wis. 2d at 591.  In *Discount Fabric House of Racine, Inc.*, the court found an advertising contract between a telephone directory service and a drapery business to be unconscionable because the

13

telephone directory service had exculpated itself from any liability for printing errors in a take-it-or-leave it agreement because the drapery business could not obtain a telephone directory advertisement from anyone else. *Id.*

"Disparity in bargaining power alone is not necessarily sufficient to establish procedural unconscionability"; it is but one element to consider. *Wis. Auto Title Loans*, 2006 WI 53, ¶ 49 n.42; *see Disc. Fabric House of Racine, Inc.*, 117 Wis. 2d at 602. Here, Waldbillig has provided no evidence that she is uneducated or unsophisticated. Instead, she was the Human Resources Coordinator for Virginia Highlands, suggesting she was trained in matters such as employer dispute-resolution policies. Although perhaps she did not fully comprehend the scope of the arbitration provision, the EDR Program was presented to Waldbillig before it was rolled out, and she explained it to others. (Waldbillig Aff. ¶¶ 3-5.) On the other hand, the borrower in *Wisconsin Auto Title Loans* was indigent, needed money, was in a weak bargaining position, and agreed to an arbitration regarding a loan at 300% annual interest. *See* 2006 WI 53, ¶¶ 50, 51, Waldbillig has not shown similar duress. Further, unlike the plaintiffs in *Wisconsin Auto Title Loans* and *Discount Fabric House*, Waldbillig was not faced with a meaningless choice or forced to agree to the arbitration terms. While alternative sources of employment may not have been plentiful or attractive to Waldbillig she had the option to quit and seek new employment, even if that option was undesirable. Any procedural unfairness was slight at best and Waldbillig was more like the employee in *Tinder*, whose arguments regarding unconscionability were rejected by the Seventh Circuit. *See* 305 F.3d at 736.

14

Case 2:08-cv-01002-CNC    Filed 04/26/10    Page 14 of 20    Document 37

In addition, the arbitration clause, was not substantively unreasonable. Waldbillig argues that the agreement is one-sided because SSC Germantown has the exclusive right to file in court claims for "injunctive relief to protect trade secrets and confidential information." (Pl.'s Br. in Resp. p. 17.) However, such claims are of a different nature than monetary compensation claims. The parties mutually agreed to arbitrate in a means that was not unfair to the Waldbillig. The *Wisconsin Auto Title Loans* court found substantive unconscionability on the part of a lender because the arbitration agreement limited only the borrower to arbitrating all claims and disputes while allowing the lender to enforce all of its claims against the borrower in court. 2006 WI 53, ¶¶ 61-66. While SSC Germantown exempted itself from arbitrating claims related to proprietary information, it did not exempt itself from arbitrating the bulk of its possible claims as did the lender in *Wisconsin Auto Title Loans*. Rather, SSC Germantown imposed arbitration on itself, too. Further, as stated above, the terms of the arbitration provision permitted employees an exception, too, i.e., to pursue certain claims outside of arbitration, in administrative agencies.

Moreover, SSC Germantown's EDR Program provides that an arbitrator will apply the same substantive federal or state law that a court would apply to the dispute and that the arbitrator may award the same relief as a court of law. (Ahlert Decl.¶ 12, Ex. 1 at 9.) Employees have given up no substantive rights or remedies, but merely changed the forum in which their claims will be heard. SSC Germantown has done the same. In addition, SSC Germantown has agreed to pay all costs of arbitration and the arbitrator except for $50, and up to $2000 for attorney fees.

15

While Waldbillig now may not like the bargain she struck regarding arbitration by remaining on-the-job after the EDR Program was implemented, that does not make the bargain unreasonable. Because there is no persuasive evidence of substantive unfairness and only slight, if any, procedural unfairness, the scales do not tip in favor of unconscionability.

Finally, Waldbillig contends SSC Germantown waived its right to compel arbitration. On September 5, 2008, Waldbillig sent a letter to SSC Germantown, outlining her wage complaints. (LaFave Aff., Ex. 5.) SSC Germantown replied, denying any wage violations but not indicating that Waldbillig should proceed through the EDR Program. (Pl.'s Br. in Resp. at 5. ) Waldbillig argues that because SSC Germantown at that time failed to mention the EDR Program, it waived its right to require arbitration. (Pl.'s Br. in Resp. at 11-12.) SSC Germantown did not raise the issue of arbitration until filing its motion to dismiss this case, five weeks after Waldbillig filed this action.

Again, under the FAA "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24. A court does not reach an inference of waiver lightly, but rather looks to the circumstances to determine whether the alleged defaulting party has acted inconsistently with the right to arbitrate. *St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co.*, 969 F.2d 585, 590 (7th Cir. 1992) ("No rigid rule exists as to what constitutes a waiver of the right to arbitrate. Instead, the issue depends on the circumstances of each particular case.").

16

SSC Germantown asserted its arbitration right five weeks after Waldbillig filed this lawsuit and less than three months after Waldbillig's initial letter outlining her wage demands. Such a delay is not unreasonable. *See Welborn Clinic v. MedQuist, Inc.,* 301 F.3d 634, 637 (7th Cir. 2002) (finding no waiver where the defendant moved to compel arbitration two months after the plaintiff filed suit); *Scaffidi v. Fiserv Inc.,* 2006 U.S. Dist. LEXIS 50546, *15 (E.D. Wis. July 20, 2006) (Stadtmueller, J.), *aff'd*, 218 F. App'x 519 (7th Cir. 2007). Moreover, nothing presented by Waldbillig indicates SSC Germantown acted inconsistently with its right to arbitrate. *See St. Mary's*, 969 F.2d at 588. Not until Waldbillig filed this case in court, clearly bypassing the EDR Program, did SSC Germantown need to assert the arbitration issue. SSC Germantown's failure to remind or invoke arbitration in response to Waldbillig's complaint letter does not rise to the level of a waiver. Thus, SSC Germantown did not waive its right to arbitrate.

(2)  To Stay or Dismiss?

The FAA provides that once the district court is satisfied that the issues in the lawsuit require arbitration, upon the application of one of the parties, the court "shall . . . *stay the trial of the action* until such arbitration has been had." 9 U.S.C. § 3 (emphasis added). Although § 3 states that courts "shall" stay an arbitrable action, implying that a stay is mandatory rather than discretionary, several courts have used their discretionary authority to dismiss actions in which all issues were arbitrable. *See Deputy v. Lehman Bros., Inc.*, 374 F. Supp. 2d 695, 711 (E.D. Wis. 2005); *see also* Angelina M. Petti, Note, *Judicial Enforcement of Arbitration Agreements: The Stay-Dismissal Dichotomy of FAA*

17

*Section 3*, 34 Hofstra L. Rev. 565 (2005) (summarizing how the circuits have addressed the stay requirement of 9 U.S.C. § 3).

Recently, in *Halim v. Great Gatsby's Auction Gallery, Inc.*, the Seventh Circuit wrote: "As this Court has noted on numerous occasions, 'the proper course of action when a party seeks to invoke an arbitration clause is to stay the proceedings rather than to dismiss outright.'" 516 F.3d 557, 561 (7th Cir. 2008) (quoting *Cont'l Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 732 n.7 (7th Cir. 2005)). However, in *Tice v. American Airlines, Inc.*, the court noted that a stay is the *normal* course of action but left open the option of dismissal in certain cases: "[D]istrict courts should retain jurisdiction over a suit that must be interrupted for reference of an issue to another forum rather than dismiss it *if, should it be dismissed, there might later be grounds for reinstating it.*" 288 F.3d 313, 318 (7th Cir. 2002) (emphasis added).

Other judges in the Eastern District of Wisconsin have found dismissal permissible. For example, in *Tupper v. Bally Total Fitness Holding Corp.*, Magistrate Judge William E. Callahan held that the FAA was not meant to limit the court's discretion to dismiss an action where the proper circumstances exist. 186 F. Supp. 2d 981, 992 (E.D. Wis. 2002). He determined that because all of the issues were subject to arbitration under Wisconsin law, it was appropriate to dismiss the action. *Id.* at 992-93. In *Deputy*, then-Chief Judge Rudolph T. Randa found it within his discretion to dismiss rather than stay an arbitrable action. After compelling arbitration, Judge Randa dismissed the action because all issues were arbitrable. 374 F. Supp. 2d at 711.

These courts and others have reasoned that dismissal of an arbitrable action is appropriate when retaining jurisdiction would be fruitless. *See Tupper*, 186 F. Supp. 2d at 992-93 (citing *Fedmet Corp. v, M/V Buyalyk*, 194 F.3d 674, 678 (5th Cir. 1999); *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir.1992)). Retention of jurisdiction serves no purpose when "post-arbitration remedies sought by the parties will not entail renewed consideration and adjudication of the merits of the controversy but would be circumscribed to a judicial review of the arbitrator's award in the limited manner prescribed by law." *Fedmet Corp.*, 194 F.3d at 678. Stay proponents contend the stay is necessary because the court must maintain a supervisory role over the arbitration to ensure its success. Petti, *supra*, at 585-86. However, because the FAA compels courts to defer to valid and enforceable arbitration agreements, that argument does not preclude a court from exercising its discretion to dismiss an arbitrable action under the proper circumstances. *See* 9 U.S.C. § 4.

Waldbillig's five claims relate to workplace disputes respecting her legally protected rights and all are arbitrable under the EDR Program. And, according to the EDR Program booklet, "[a]t the end of the Arbitration, the arbitrator issues a written decision that is binding on both [the employee] and the Company." (Ahlert Decl. Ex. 1 at 8 of 15.) No advisory arbitration decision or appeal to a court are indicated. Referral to arbitration is not an interruption of the court proceedings. Regardless, after arbitration there will be no grounds for reinstating this case. Consequently, the circumstances and documents persuade the court to exercise its discretion in favor of dismissal, as retaining jurisdiction would serve no purpose. Hence,

19

IT IS ORDERED that SSC Germantown's Rule 12(b)(1) motion is denied.

However, inasmuch as Waldbillig has agreed to arbitrate the dispute with SSC Germantown that is underlying this action, but has failed to do so, and the arbitration agreement is valid and enforceable, pursuant to SSC Germantown's alternate request,

IT IS ORDERED that Waldbillig must arbitrate her claims rather than pursue them in this court.

Further, because all of the issues in this case are arbitrable, under 9 U.S.C. § 3 and this court's discretion to dismiss an action involving arbitrable claims under the proper circumstances,

IT IS ORDERED that this case is dismissed rather than stayed.

Dated at Milwaukee, Wisconsin, this 26th day of April, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE